# EXHIBIT A

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

-------------------------------------------------------------------X
In the Matter of the Arbitration Between          **FINRA Arbitration No:**

ADAM GROSS,

     Claimant,

  -and-

              **STATEMENT OF CLAIM**

HSBC SECURITIES (USA) INC.,

     Respondent.
-------------------------------------------------------------------X

  Claimant, **Adam Gross**, by his attorneys Kaiser Saurborn & Mair, P.C., as and for her request for claims against respondent alleges as follows:

## PARTIES, JURISDICTION AND VENUE

  1. Claimant, Adam Gross, CRD No. 3080320, ("plaintiff" or "Gross"), is formerly employed by HSBC.

  2. Respondent, HSBC Securities (USA) Inc., CRD No. 19585, ("HSBC" or "Defendant"), is a banking institution authorized to do business in New York State.

  3. Adam Gross is a former Managing Director employed by HSBC.

  4. Throughout his tenure HSBC, Mr. Gross was a strong performer and has consistently received glowing performance evaluations.  Additionally, Mr. Gross was deeply involved in a variety of diversity and inclusion efforts at HSBC.

  5. Nonetheless, Mr. Gross was retaliated against because he objected to business practices that potentially violated Federal Securities laws, did not accept a voluntary separation agreement and was further subject to gender and age discrimination.

  6. HSBC's actions constituted violations of Sarbanes-Oxley (18 U.S.C. 1514 A). and further are prohibited discrimination and retaliation, pursuant to New York State Human

Rights Law, N.Y. Exec. Law § 296 *et seq.*, New York Labor Law § 1 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107, 8-502 *et seq.*

7.   In this proceeding, Mr. Gross seeks expungement of the stated reasons in his U-5 for his termination. Specifically, his U-5 states that he was terminated because:

> Employee discharged as a result of using a prohibited electronic communication platform to communicate with a prospect regarding a hedge fund not approved for sale by the Firm.

8.   These reasons are false as articulated in section 44 and 45

9.   HSBC, as part of a global resolution of this matter, has agreed to not oppose Mr. Gross' request for expungement.

10.   The U-5 language should be deleted and replaced with the following language:

> "Mr. Gross was laid off without cause"

## I.

## MR. GROSS' EMPLOYMENT

11.   In January 2018 Mr. Gross was hired as a Managing Director (GCB3) Head of ISPS for the US, which included head of Investment Products, Deposits, Custody and Investment Counselors He reported to Russell Schofield-Bezer ("RSB").

12.   Upon his hiring in the first quarter of 2018 he was told to assess talent, replace Investment Counselors ("IC"), and enhance the quality of the team.

13.   As a part of that on-going effort, he was advised to reorganize talent and subsequently terminated three IC's and hired five IC's which included the hiring of two Mandarin speaking women, one Spanish speaking woman and two men. This increased the gender balance in his department.

14.     During the second and third quarters of 2018 Mr. Gross assessed businesses of Investment Product Specialists and Investment Counselors. This included implementing changes to daily morning calls by driving content and presentation skills, holding weekly team meetings and creating weekly investment forums.

15.     Mr. Gross' Performance Review for 2018 was "Good" and Behavior was "Strong." He was advised that first year employees are rarely given a "Strong" rating. However, as Mr. Gross observed during "Talent Reviews" a bell curve was applied to ensure proper gender balance within ratings and actual Performance ratings were hindered by conscience decisions to award females a higher ranking to create a more balanced portrayal within the organization.

16.     Mr. Gross also participated in a substantial amount of volunteer work at HSBC. He joined Balance (Employee Resource Group dedicated to women) as well as other ERG groups for Indian, Caribbean and African American employees, sponsored a volunteer event cleaning up the East River, participated in the Virtual Enterprise International event, participated in other volunteer events and created a plan for graduates to present to ExCo.

17.     His efforts to help others enhance their careers and bring a higher level of collaboration with junior and senior employees was not required but rather driven by his desire to make HSBC a more inclusive and collaborative workplace.

18.     In short, Mr. Gross executed expertly the business plan he was hired to implement. His fall from grace only followed his push back on business practices that violated federal law and his speaking up against internal policies that hindered business.

## II.

## MR. GROSS OBJECTED TO ILLEGAL BUSINESS PRACTICES

19. Sometime during mid 2018 Mr. Gross noticed HSBC was engaged in questionable business practices relating to the payment of commissions.

20. When Mr. Gross brought this topic up to others in the firm, its response was that this is how the Bank has always done business.

21. During mid-2019 Mr. Gross again raised this issue with Craig Tucker, Supervisory Manager, and he in turn addressed to it Legal and Compliance.

22. At a minimum, even if the practice could be in some part justified, the commissions payment practices, taken as a whole, were not compliant.

23. In 2019, Mr. Gross created a pain point deck for senior management that addressed many challenges his team faced due to policy, procedure and technology. He again expressed his opposition to certain internal business practices he believed illicit.

24. His objections were dismissed out of hand.

## III.

## MR. GROSS, WITHOUT CREDIBLE CAUSE, WAS TARGETED IN AN INVESTIGATION

25. During the second quarter of 2019, a colleague of Mr. Gross, Ms. Jean Bifano (Head of Business Strategy), advised Mr. Gross that one of his direct reports, Joana Li, "dressed like a prostitute" and he needed to say something to her. Mr. Gross asked Ms. Bifano if she wanted to discuss directly with Joana and Ms. Bifano refused.

26. Subsequently, Mr. Gross shared this comment with Karen Januzzo, HR representative. As far as Mr. Gross is aware, HSBC has never addressed this issue with Ms. Bifano. This is an example of the glaring double standard at HSBC.

27. Another example of this was when Lisa Carbone, Head of Risk and Regulatory Compliance, and Ms. Bifano made comments about how men dressed while on a Zoom call, comments that would have been met with serious punishment if made by a male concerning female employees.

28. While Mr. Gross' Performance Review for 2019 was "Strong" and Behavior rating was "Strong" in March 2020, Mr. Gross was contacted by Employee Relations about an accusation by Nicole Wong, Relationship Manager, that was described as Making her feel uncomfortable." There was no harassment accusation, no sexual misconduct and only her word against his. HSBC rendered a hasty decision against Mr. Gross and forty percent of his bonus was taken away and his performance rating was lowered retroactively.

29. Further, he was given a final warning. Mr. Gross later appealed the decision and was denied.

30. Mr. Gross was never previously involved in any HR issues and was told by Ms. Januzzo that no other complaints existed concerning his workplace conduct, rendering a final warning surprising. Mr. Gross believes Ms. Wong retaliated against him for reporting her to HR and her boss, Michael Cerminaro for both performance issues and false accusations she has made against another employee.

31. Ms. Wong has a well-known history of misinterpreting conversations and misreading social and professional cues. Mr. Gross had previously received numerous complaints about her performance and inability to comprehend conversations from members of his team, as well as clients, one of whom asked that she be removed from his business for this exact reason.

32.     Mr. Gross raised the issue of Ms. Wong's performance with her boss prior to her accusation. Yet, despite this history of performance issues and miscommunication, HSBC chose to take her word over that of Mr. Gross.

33.     Indeed, prior to this incident/accusation, it was brought to Mr. Gross' attention by several employees that Ms. Wong was spreading a rumor that one of Mr. Gross' team members had been sexually inappropriate around her. Mr. Gross advised HR that she was slandering his name and yet nothing to his knowledge was ever done about it. The Bank never conducted an investigation or questioned his team member.

34.     It was shortly after Mr. Gross reported Ms. Wong to Mr. Cerminaro and Ms. Januzzo that the accusation against him occurred. Mike Cerminaro made a comment to Mr. Gross when discussing the fact that she was removed from her client's business that he was afraid to reprimand her (or something like that) because he was nervous she would make false accusations to HR.

35.     In mid to late 2019 Mr. Gross reported to HR and Joe Abruzzo that Ms. Bifano was difficult to work with, she didn't communicate, was often incorrect on investment subject matter and was extremely confrontational. This behavior was substantiated by her former manager, Dennis Duggan, during the 2019 talent review.

36.     Additionally, Mr. Gross reported Ms. Bifano to HR and Mark Pittsey on two different occasions in writing about her abusive behavior towards him in front of colleagues that made him and his team members extremely uncomfortable.

37.     The Bank entirely ignored his objections to Ms. Bifano's conduct. If it were Mr. Gross' behavior toward female colleagues at issue the response from HSBC would have been swift and severe.

38. On August 28th, Mr. Gross received an email at 2pm to accept a Zoom meeting at 2:30pm with 4 people (Financial Crime Risk, HR Employee Relations and Legal). During the meeting he was accused of using WeChat to communicate with a prospect and making a recommendation for a non HSBC Hedge Fund to a woman referred to as Cindy Q.

39. Mr. Gross met Cindy Q in Q3 2019 when she attended a presentation for a prospect and friend of hers, Lan Shi, at HSBC's office. Winnie Peng was the Relationship Manager and John Bradarich was to be the Investment Counselor for Ms. Shi.

40. Both Ms. Peng and Mr. Bradarich were in attendance at this earlier meeting with Cindy Q. As the meeting concluded with Ms. Shi, Cindy Q stayed back to ask questions and while Mr. Gross mentioned that he cannot talk specifically about Ms. Shi due to confidentiality, he could discuss general topics and asked her questions. Cindy Q shared her happiness with her advisor at Goldman Sachs and shared a story about her negative experience from not diversifying her concentrated GDS stock. She was not the prospect.

41. In the following days/weeks Cindy Q needed to get a visa from the Brazilian consulate and Ms. Peng and Ms. Shi asked if there was anything the Bank could do to help. Mr. Gross asked his Latin American team colleagues if they knew anyone at the consulate. They shared with him that she just needed to go there and wait, but to show up early.

42. Ms. Peng told Mr. Gross to communicate with Cindy Q via WeChat. In fact, Ms. Peng introduced Mr. Gross to WeChat and showed him how to download and use it. Mr. Gross advised her that business cannot be conducted on WeChat. She connected him to Cindy Q, and Cindy Q and he communicated using WeChat as this was the only form of communication that she claimed to use. Mr. Gross also did not want to use firm email for non-firm related matters.

43. During the course of the next year, Mr. Gross would contact Cindy Q from time to time to inquire how she was faring through Covid and to attempt to maintain a dialogue. In one text exchange she invited him to an event which he could not attend. He decided to ask if she was interested in meeting a hedge fund manager that he thought might be of interest given his focus on small cap and her interest in tech. It was a suggestion for an introduction and not a solicitation to invest with the fund.

44. Mr. Gross received no response and did not follow up. He was not receiving any compensation or benefit in any form relating to this proposed introduction. His intention was to enhance her network. Like many professionals, Mr. Gross networks with friends and colleagues. He is keenly aware of the "Selling Away" policy. As a salesperson, maintaining contact with people is key.

45. Bottom line is that Mr. Gross violated no policies by his communications with Cindy Q. Rather, the Bank is seizing on an innocuous issue to target him. Furthermore, Mr. Gross was informed by Mark Pittsey in June 2020 that he was "on the list" for reduction as the firm planned to move ahead with both voluntary and involuntary reduction in force and Mr. Gross was even told that the budget would be need to incur greater cuts than originally planned. Mr. Pittsey informed Mr. Gross of this while also letting him know he was eligible for the Voluntary Separation Plan ("VSP"). While no direct suggestion was made by Mr. Pittsey to accept the VSP, the inference was clear.

46. Mr. Gross' sudden fall from grace, following his pushback on the Bank's unlawful business practices, is the consequence of retaliation as well as an obvious double standard as it pertains to males versus females. Any suggestion of improper conduct by males

such as Mr. Gross are reacted to way disproportionately and female employees can get away with just about anything. Gender discrimination is wrong no matter who the perpetrator.

47. On September 1, 2020 HSBC summarily terminated Mr. Gross. The discharge was the product of illegal retaliation and discrimination.

48. Separately, when employee cuts were discussed last year, there was a focus at the Bank on bringing in junior people and cutting older individuals. In the Markets business, the term "juniorization" was used. This is an effort to reduce older males. This was yet another motivation for the inexplicable termination of Mr. Gross.

49. Mr. Gross was terminated in retaliation for his protected conduct and because of age and gender discrimination.

50. Mr. Gross respectfully requests that his U-5 be expunged as to the reasons for his termination as it did not violate any regulatory or internal HBSC policy and replaced with the language suggested above.

Dated: New York, New York
      February 12, 2021

**KAISER SAURBORN & MAIR, P.C.**

By:_____
    Daniel J. Kaiser, Esq.

Attorney for Claimant
30 Broad Street, 37th Fl.
New York, New York 10004
(212) 338-9100